No. 16,326.

WATROUS, STATE HIGHWAY ENGINEER ET AL. *v.* GOLDEN CHAMBER OF COMMERCE ET AL.

(218 P. [2d] 498)

Decided April 3, 1950.

Mr. John W. Metzger, Attorney General, Mr. Allen Moore, Deputy, Mr. Donald C. McKinlay, Assistant, for plaintiffs in error.

Mr. Omar C. Garwood, Mr. Milton C. Garwood, for defendants in error, plaintiffs below; Mr. Harold H. Menzel, Mr. William B. Naugle, for defendants in error, interveners.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

The Golden Chamber of Commerce, a corporation, and individuals suing on behalf of themselves and all other persons who are similarly situated and interested, brought an action for a declaratory judgment to test the constitutionality of an act passed by the Thirty-seventh Session of the General Assembly, known as House Bill No. 833 (S.L. '49, p. 601, c. 215), wherein Mark U. Watrous as State Highway Engineer; the State Highway Department, a body corporate; W. Lee Knous as Governor of Colorado, and individuals named as mem-

bers of the Colorado State Highway Advisory Board; and Trustees of the State Highway Department, were named as defendants.

Ray R. Page and Joe S. Johnson, on behalf of themselves and all other persons similarly situated and interested, were granted leave to intervene, and their complaint in intervention was thereupon filed. The trial was to the court, at the conclusion of which the parties stipulated that all the issues in the proceedings be treated and considered as a motion of defendants for summary judgment, whereupon the court granted the motion and entered judgment in favor of plaintiffs and interveners against defendants, who seek a reversal of the judgment by writ of error.

In the complaint, and in the complaint in intervention, plaintiffs and interveners, after stating the capacity in which they maintain this class action, alleged the various official capacities of defendants. It then is alleged that the action is brought to obtain a judicial determination of the constitutionality of said House Bill No. 833, a copy of which was attached as an exhibit. It also is alleged that the traveling public is entitled to a free and unrestricted use of all public highways in Colorado, but that, under the provisions of said house bill, plaintiffs and interveners, and others similarly situated, will be denied the use of said highways unless payment by them is made of a fee or toll charge to be fixed by defendants; this notwithstanding said toll roads or turnpikes will be built and maintained with public funds realized from the sale of bonds issued by the state of Colorado, and notwithstanding the fact that the toll roads or turnpikes will be public highways under the jurisdiction of the State Highway Department and will be operated and maintained at public expense. It is further alleged that under the provisions of said house bill all state highways in Colorado can be operated and maintained as toll roads or turnpikes and thereby destroy Colorado's system of free public highways.

House Bill No. 833, it is alleged, is unconstitutional, illegal and void because it violates:  1. Section 16 of article X of the Constitution in that it attempts to authorize expenditures during a fiscal year in excess of the revenue provided by law for such expenditures.  2. Section 33 of article V of the Constitution by permitting the payment of money out of the treasury without appropriation therefor made by law.  3. Sections 1 and 21 of article V of the Constitution because said bill contains more than one subject, none of which is clearly expressed in the title.  4. Article III of the Constitution by delegating non-delegable legislative powers to defendants.  5. Section 18 of article X of the Constitution because it undertakes unlawfully to divert funds earmarked for construction, maintenance and supervision of public highways.  6. Article X of the Constitution by authorizing the expenditure of tax revenues in ways and for purposes unauthorized by law.  7. Sections 3 and 4 of article XI of the Constitution by the creation of a debt in excess of lawful limitations imposed by said sections.

It further is alleged that the joint resolution provided in section 2 (f) (2) of said house bill, and referred to in subsequent sections, is a nullity because not passed and approved in accordance with section 17 of article V of the Constitution and as required by section 39, article V thereof.

Also it is alleged that defendants will, unless restrained by order of court, improvidently contract for preliminary legal and engineering services in connection with the turnpike or toll road, and that they presently contemplate the expenditure of $303,000 for such services; further, it is alleged that the toll road or turnpike to be constructed under said house bill is estimated to cost $5,300,000, notwithstanding which it will probably cost three or four times that sum, and the toll charges for the use of the proposed highway will be far short of liquidating the bonds to be issued under said house bill,

and thereupon the state will be burdened with a continuing bond debt which cannot be liquidated except by revenues other than toll charges, and, consequently, general taxation revenues and resources of the state will be necessary to liquidate the same. Further, it is alleged that the defendants are now planning to expend many millions of dollars of public funds in payment for other turnpikes or toll roads and also to issue many millions of dollars of Colorado state bonds in payment for such construction.

Plaintiffs pray for an injunction restraining defendants from undertaking the execution of any of the powers attempted to be granted them under said house bill and from attempting to carry into effect the provisions thereof or incurring any expense whatever in connection therewith and from issuing any toll road or turnpike bonds. Further, that said house bill, and each and every of its sections, be declared unconstitutional and void.

Defendants filed their motion to dismiss the complaint, and complaint in intervention on the following grounds: 1. Because the complaints fail to state a claim against the defendants. 2. Or, in lieu of the motion to dismiss, to quash the service of summons because it is an action against the state of Colorado in its sovereign capacity. 3. Because the plaintiffs have no real interest in the matter.

At the trial the resolution of the State Highway Advisory Board, adopted by the unanimous vote of the members thereof, approved by the State Highway Engineer and the Governor of the State of Colorado, was offered, and, without objection, received in evidence, the pertinent parts of said resolution being as follows:

"Section 1. That the construction and operation of a turnpike between the City and County of Denver and the City of Boulder is hereby authorized and approved.

"Section 2. That for the purpose of defraying the cost of constructing said turnpike, there shall be issued bonds

of the State of Colorado designated as 'Denver-Boulder Turnpike Revenue Bonds' in an amount sufficient to pay such cost (now estimated to be approximately $5,300,-000.00) said bonds to mature serially over a period beginning not earlier than two years from the date of said bonds and ending not later than thirty years from the date thereof and to be payable from a special fund which is hereby created and into which fund there shall be paid and set aside: (a) Fares and tolls derived from the operation of said turnpike, and (b) From the proceeds in the State Highway Fund (derived from the imposition of licenses, registration and other charges with respect to the operation of any motor vehicle upon any public highway of the State and the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel), an amount not exceeding in any one year thirty per cent of the amount of principal and interest falling due during such year and not to exceed thirty per cent of the amount required to create a reasonable reserve for the payment of said bonds.

"Section 3. That the State Highway Department shall further investigate the marketing and sale of said bonds to ascertain the terms and conditions under which they may be marketed and sold to the best interests of the State of Colorado. After making such determination, the State Highway Department by further action shall adopt a definitive resolution, consistent with this resolution, defining the terms and conditions under which said bonds shall be issued, providing for the sale thereof and prescribing the bond form and other details in connection therewith.

"Section 4. The State Highway Department may covenant to pay the cost of maintaining, repairing and operating said turnpike to the end that the gross revenues derived from the operation of the turnpike will be pledged to the extent provided above to the payment of said bonds.

"Section 5. That the Secretary of the Highway Ad-

visory Board be and he hereby is authorized to submit a certified copy of this resolution to the General Assembly for its approval in accordance with the provisions of House Bill No. 833.

"Passed, Adopted and Approved this 15 day of April, 1949."

Upon the certification of the resolution to which we have hereinbefore referred, the General Assembly approved and adopted Senate Joint Resolution No. 24. Said joint resolution was offered and received in evidence without objection. It reads as follows:

"Whereas, House Bill No. 833 enacted by the Thirty-seventh General Assembly and approved by the Governor authorizes the State Highway Department to create and set aside in a special sinking fund and to pledge from the proceeds in the State Highway fund an amount sufficient to insure the payment of the principal of and interest on bonds authorized to be issued under said law to the extent provided thereby and subject to the approval by joint resolution of the Senate and House of Representatives; and

"Whereas, The State Highway Department by resolution adopted the 13th day of April, 1949, for the purpose of defraying the cost of constructing a Turnpike between the City and County of Denver and the City of Boulder authorized the issuance of the bonds of the State of Colorado in an amount sufficient to pay such cost (estimated to be approximately $5,300,000.00) said bonds to be payable from a special fund created by said resolution into which fund there should be paid and set aside an amount not exceeding in any one year thirty percent of the amount of principal and interest falling due during such year and thirty percent of the amount required to create a reasonable reserve for the payment of said bonds.

"Now therefore, Be it resolved By The Senate of The Thirty-Seventh General Assembly, The House of Representatives concurring herein, That the creation of said

special sinking fund and the making of said pledge as above recited be and the same is hereby approved, provided, however, that the amount to be paid by the State into the special sinking fund shall not exceed 30% of the total of the following; (A) $5,300,000.00 (B) interest thereon at a rate of not exceeding three percentum per annum until said principal sum is paid. This resolution does not place a limitation on the cost of the project or the amount of bonds to be issued, but only on the obligation of this state to make payments from The State Highway Fund into the special sinking fund to secure the payment of the bonds."

As hereinbefore mentioned, House Bill No. 833 is found at page 601, chapter 215, 1949 Session Laws of Colorado. Its title is, "An Act Authorizing the Construction and Operation of Turnpikes and Providing for the Financing of the Cost of Construction by the Issuance of the Bonds of the State of Colorado." The act consists of seventeen sections, which may be thus summarized:

Section 1 is a declaration of purpose and confers additional powers on the State Highway Department.

Section 2 is a grant of additional powers:

(a) To adopt, with the assistance of the State Engineer, a master plan for the development and improvement of turnpikes in unincorporated territory within the state;

(b) To construct, operate, maintain, improve and reconstruct turnpikes in unincorporated territory within the state, *which turnpikes shall be public highways of the state.*

(c) To enter into contracts and agreements with the United States of America, or any of its agencies or departments, or with public corporations within the state incidental to the performance of its duties and the execution of its powers under this act; provided that any contract relating to the financing of any such mainte-

nance or improvement shall be first approved by the governor;

(d) To establish and collect tolls for the privilege of traveling along and over said turnpikes and to adopt rules and regulations governing the use of the same;

(e) To set aside in a *special sinking fund* and *to pledge all tolls and income to the payment of the principal and interest on the bonds hereinafter authorized to be issued.*

(f) To set aside in a *special sinking fund* and to *pledge* from the proceeds in the state highway fund derived from certain license fees and gasoline taxes an amount sufficient to insure the payment of the principal and interest on the bonds hereinafter authorized promptly when the same become due and payable, with a proviso *"that any such pledge shall first be approved by joint resolution of the Senate and House of Representatives"* and with the further proviso "that the amount so set aside and pledged shall not exceed in any one year thirty per cent of the total of the following:" 1. Principal and interest falling due in such year; 2. a reasonable reserve for the payment of the bonds, authorized by the state highway department and *approved by joint resolution of the Senate and House of Representatives.*

(g) To accept grants from the United States or any agency or department thereof.

(h) To designate as a turnpike project a described territory or a described portion of a highway system of the state to be constructed or improved under this act.

Section 3. For defraying the costs of construction of any such turnpike and expenses in connection therewith, the *state highway department* is authorized, upon the *affirmative majority vote of the Highway Advisory Board,* together with the *affirmative vote of the Governor and the State Engineer,* to issue bonds of the State of Colorado, payable from a fund made up of the fees, fares and tolls derived from the use of any such turn-

pike and with the approval of the General Assembly by joint resolution. The payment of said bonds shall be additionally secured by a pledge of moneys from a *special fund* set aside from the *State Highway Fund*, with the proviso that the amount to be set aside and pledged in any one year shall not exceed thirty per cent of the total of the following: (1) The amount of principal and interest falling due during such year, and (2) the amount required to be paid into said special fund as a reasonable reserve for the payment of the bonds to be authorized hereunder.

Section 4. The bonds shall bear interest not exceeding three per cent per annum and shall be due and payable not more than thirty years from the date thereof, with proviso for prior redemption, and shall be due and payable at a place or places fixed by the State Highway Department; shall contain on their face the designation of the project, and shall be negotiable instruments.

Section 5. Authorizes the State Highway Department to secure the payment of the bonds by a trust indenture.

Section 6. Authorizes the State Highway Department to establish fees and tolls sufficient in amount to pay at least seventy per cent of the principal and interest on the bonds as the same become due; authorizes said department to create a special sinking fund for the payment of principal and interest, and provides that in this special sinking fund all income from the operation of the project, as well as all moneys set aside and pledged from the State Highway Fund not exceeding in any one year thirty per cent of the total of the following: (1) The principal and interest falling due during such year, and (2) the amount required to be paid into a special sinking fund as a reasonable reserve for the payment of the bonds.

The State Highway Department is permitted by resolution, adopted prior to the issuance of the bonds, to pay the cost of maintaining the turnpike, and this resolution, when adopted, shall have the force and effect of a con-

tract between the state of Colorado and the holders of the bonds.

In event thirty per cent of the principal and the amount required for the reserve fund is not necessary in any one year, it may be utilized by the State Highway Department for maintaining and repairing the turnpike without impairing the obligation of the state to maintain the same. The bonds are to constitute an irrevocable charge against the fund, the same to be kept by the state treasurer in a separate account.

Section 7. Subject only to the limitations of this act, the bonds issued shall constitute a first lien on the proceeds from charges, registration and gasoline taxes, subject only to the State of Colorado State Highway fund revenue anticipation warrants dated June 1, 1936.

Section 8. The proceeds from the sale of all bonds are to be applied to the payment of the cost of the turnpike project.

Section 9. No taxes or assessments are to be required on the property acquired or used hereunder.

Section 10. The State Highway Department is authorized to provide by resolution for the issuance of refunding bonds.

Section 11. Bondholders are authorized to protect and enforce their rights under the bonds by litigation.

Section 12. Upon the payment of all of the bonds and interest thereon, the turnpike shall thereafter be maintained by the State Highway Department free of tolls, and it is further provided that any funds, as well as other personal property, shall be used and disposed of by the State Highway Department as provided by law.

Section 13. The provisions of the act shall not be construed as authorizing the state to contract a debt by loan nor the pledging of its general taxes.

Section 14. Provides that the powers conferred and the duties imposed upon the State Highway Department shall be exercised and performed by any successor thereof.

Section 15. The separability clause. Section 16. The safety clause. Section 17. The emergency clause.

At the trial Mark U. Watrous testified. He identified the resolution of the State Advisory Board, hereinbefore set forth, and a copy of the same was admitted in evidence without objection; also a copy of Senate Joint Resolution No. 24 was offered, and, without objection, admitted, being the same as hereinbefore set out. With reference to said joint resolution, it was stipulated that the same was not signed by the Governor of the State of Colorado.

There were two principal questions presented at the hearing before the trial court, both of which go to the constitutionality of House Bill No. 833. These two questions may be thus stated:   1. The inefficacy of the approval by Senate Joint Resolution No. 24; and 2. the provisions of the act with reference to the pledging of public moneys. These were the only matters presented to the lower court for its determination, and at the conclusion of the evidence, the following occurred:

"The Court:  Can we resolve the issue, then, that in order to pledge the credit of the state, instead of it being done by resolution, it must be done by bill initiated in the house and following through in the regular proceeding?

"Mr. Menzel: You are willing to concede that be the holding of this court?

"Mr. Metzger: Let the record show that the State feels in doubt about the constitutionality of the pledge of funds by the method or means of Joint Resolution, whether or not it is signed by the Governor. * * * We feel there is a grave doubt as to the constitutionality of the measure which seeks to pledge funds of the State of Colorado by means of Joint Resolution, regardless of its being signed or not signed, or presented to the Governor for signature. On that basis, we ask the Court to make that holding and resolve the other grounds in favor of defendants.

"The Court: I am finding that the bill is constitutional in all respects except that one part, and that any bonds, providing they are issued legally, will be a binding obligation."

The court also, at the conclusion of the evidence and arguments, made and entered a summary judgment, to which no objection appears to have been offered by either plaintiffs or interveners. It reads as follows:

"The above entitled action came on for hearing on the application of the plaintiffs and plaintiffs in intervention for the issuance of a temporary writ of injunction, and upon defendants' Motion to Dismiss the complaints of said plaintiffs and plaintiffs in intervention, the parties appearing by their respective attorneys of record. The parties thereupon stipulated and agreed that all of the issues in the proceedings be treated and considered as on a motion of defendants for summary judgment.

"After argument of counsel and due consideration of the matter, including the pleadings, records and files herein, and being fully advised in the premises, the Court hereby makes the following findings of fact and conclusions of law:

### Findings of Fact

"1. That the Thirty-Seventh General Assembly duly enacted and the Governor approved on April 15, 1949, House Bill No. 833 'An act authorizing the construction and operation of turnpikes and providing for the financing of the cost of construction by the issuance of the bonds of the State of Colorado.'

"2. That thereafter, pursuant to said act, the State Highway Advisory Board duly adopted a resolution approved by the State Highway Engineer and the Governor on April 15, 1949, to construct and operate a turnpike between the City and County of Denver, and the City of Boulder, to issue bonds of the State of Colorado designated as 'Denver-Boulder Turnpike Revenue Bonds' in an amount sufficient to pay such cost payable

from a special fund created by the resolution into which there was directed to be paid and set aside (a) fares and tolls derived from the operation of said turnpike, and (b) from the proceeds in the State Highway Fund an amount not exceeding in any one year 30% of the amount of the principal and interest falling due during such year and not to exceed 30% of the amount required to create a reasonable reserve for the payment of the bonds; to investigate the marketing and sale of said bonds to ascertain the terms and conditions under which they may be marketed and sold, to adopt a definitive resolution regarding the issuance of said bonds; to covenant to pay the cost of maintaining, repairing and operating such turnpike to the end that the gross revenues derived from the operation of the turnpike would be pledged to the extent provided in the resolution to the payments of the bonds and to authorize the Secretary of the Highway Advisory Board to submit a certified copy of the resolution to the General Assembly for its approval in accordance with the provisions of House Bill No. 833.

"3. That thereafter, pursuant to House Bill No. 833, the General Assembly adopted Senate Joint Resolution No. 24, reciting the authority of the General Assembly under House Bill No. 833, and the adoption of the Resolution of the State Highway Advisory Board as approved by the State Highway Engineer and the Governor, and thereupon resolved that the creation of the special sinking fund and the making of the pledge as recited therein was approved, provided, however, that the amount to be paid by the State into the Special Sinking Fund shall not exceed 30% of the total of the following: (a) $5,300,000.00, (b) interest thereon at a rate of not exceeding 3% until the principal sum is paid. The resolution then stated that it did not place a limitation on the cost of the project or the amount of the bonds to be issued but only on the obligation of the State to make

payments from the State Highway Fund into the Special Sinking Fund to secure the payment of the bonds.

"4. That Senate Joint Resolution No. 24 was duly signed by the President of the Senate, the Speaker of the House and the respective Secretary and Chief Clerk thereof, but was not presented to the Governor as required by Section 39, Article V. of the State Constitution, or otherwise.

\* \* \*

## Conclusions of Law

"1. That said House Bill No. 833 is constitutional and valid in all respects as to the powers granted to the State Highway Department to construct, operate, maintain, improve and reconstruct turnpikes in the unincorporated territory in the State and to provide for the financing of the cost of construction thereof by the issuance of the bonds of the State of Colorado but those provisions of said House Bill No. 833 which provide for certain approvals in connection therewith by Joint Resolution of the Senate and House of Representatives of the General Assembly are unconstitutional, invalid and of no legal force and effect, as hereinafter set forth.

"2. Senate Joint Resolution No. 24 is void and without legal effect for the reason that a valid approval of the creation of a special sinking fund and a reasonable reserve therefor and the pledging of the proceeds in the State Highway Fund by the State Highway Advisory Board to insure the payment of the principal and interest on the bonds authorized to be issued pursuant to the Act, or, the valid approval of the issuance of such bonds, cannot be made by the adoption of a joint resolution by the General Assembly since such approval must be by the enactment of a law as provided by Section 17, Article V of the State Constitution, and otherwise, and not by a joint resolution, whether or not such resolution be presented to the Governor as required by Section 39, Article V of the State Constitution, since a joint resolution although regularly adopted is a mere nullity and

does not have the force and effect of a bill enacted into law as required by the Constitution.

"3. That any Boulder Turnpike Revenue Bonds authorized by Resolution of the State Highway Advisory Board and approved pursuant to the Senate Joint Resolution No. 24 would be invalid.

"4. That the State Highway Department may lawfully proceed with the adoption of a master plan for the development and improvement of the State Highway System by the construction of turnpikes in the unincorporated territory within the State including the required surveys, steps and proceedings incident to the Denver-Boulder Turnpike, except as to the issuance of bonds or the incurring of any expenses in connection with the issuance of such bonds.

"5. That plaintiffs and plaintiffs in intervention are entitled to an injunction restraining and prohibiting the defendants and each of them from issuing any bonds pursuant to said resolution or resolutions or from making any expenditures in connection with the issuance of said bonds, upon the giving of an injunction bond, conditioned as required by law, with sufficient sureties to be approved by the Clerk of the Court in the sum of $100.00 as hereinafter ordered.

"It is therefore ordered, adjudged and decreed:

"1. That defendants' Motion for Summary Judgment is denied, and that judgment is hereby entered in this cause in favor of plaintiffs and plaintiffs in intervention and against defendants to the extent and in the manner set forth in the Findings of Fact and Conclusions of law herein.

"2. That there issue out of and under the Seal of this Honorable Court an injunction restraining, enjoining and prohibiting the defendants, their officers, agents and employees and all others acting in aid or assistance of them from issuing any bonds pursuant to said resolution or resolutions or from making any expenditures in connection with the issuance of said bonds upon the giving

of an injunction bond, conditioned as required by law, with sufficient sureties to be approved by the Clerk of this Court, in the penal sum of $100.00 by the Golden Chamber of Commerce, a Corporation, Lu Holland, Fred H. Craig, Orville L. Dennis, Fred Wolf, and M. L. Holland, plaintiffs herein.

"3. That defendants be given sixty days in which to prepare and tender a reporter's transcript and execution is hereby stayed for said period of sixty days.

"Done in open Court this 2nd day of July A. D. 1949."

The specifications of points upon which defendants rely for a reversal of the judgment are as follows:

"1. The said District Court erred in concluding, as a matter of law, that: (a) The provisions of House Bill No. 833, which provide for certain approvals by Joint Resolution of the General Assembly in connection with the exercise of the powers granted to the State Highway Department by said Act, are unconstitutional, invalid and of no legal force and effect. (b) Senate Joint Resolution No. 24, adopted by the Thirty-seventh General Assembly, relative to the Denver-Boulder Turnpike, is void and without legal effect. (c) Any Boulder Turnpike Revenue Bonds authorized by Resolution of the State Highway Advisory Board and approved pursuant to Senate Joint Resolution No. 24, would be invalid. (d) The State Highway Department, in proceeding with the adoption of a master plan for the development and improvement of the State Highway System by the construction of turnpikes, may not proceed with the issuance of bonds or the incurring of any expense in connection with the issuance of such bonds. (e) The Plaintiffs and Plaintiffs in Intervention are entitled to an injunction restraining the Defendants and each of them from issuing any bonds pursuant to said Resolution or Resolutions or from making any expenditures in connection with the issuance of said bonds."

"2. The said District Court erred further: (a) In denying Defendants' motion for Summary Judgment

and in entering a Summary Judgment in favor of Plaintiffs and Plaintiffs in Intervention, and against Defendants to the extent and in the manner set forth in the Findings of Fact and Conclusions of Law therein. (b) In issuing the injunction as described and set forth in its Summary Judgment."

It should be borne in mind that the trial court held:

"That said House Bill No. 833 is constitutional and valid in all respects as to the powers granted to the State Highway Department to construct, operate, maintain, improve and reconstruct turnpikes in the unincorporated territory in the State and to provide for the financing of the cost of construction thereof by the issuance of the bonds of the State of Colorado *but those provisions of said House Bill No. 833 which provide for certain approvals in connection therewith by Joint Resolution of the Senate and House of Representatives of the General Assembly are unconstitutional, invalid and of no legal force and effect, as hereinafter set forth.*"

\* \* \*

"Senate Joint Resolution No. 24 is void and without legal effect for the reason that a valid approval of the creation of a special sinking fund and a reasonable reserve therefor and the pledging of the proceeds in the State Highway Fund by the State Highway Advisory Board to insure the payment of the principal and interest on the bonds authorized to be issued pursuant to the Act, or, the valid approval of the issuance of such bonds, *cannot be made by the adoption of a joint resolution by the General Assembly since such approval must be by the enactment of a law as provided by Section 17, Article V of the State Constitution,* and otherwise, and not by a joint resolution, whether or not such resolution be presented to the Governor as required by Section 39, Article V of the State Constitution, since a joint resolution although regularly adopted is a mere nullity and does not have the force and effect of a bill enacted into law as required by the Constitution." (Italics ours)

Plaintiffs and interveners contend that in addition to the invalidity and ineffectuality of Senate Joint Resolution No. 24, House Bill No. 833 provides for the creation of a debt of the State of Colorado in excess, and in violation, of constitutional provisions.

We can dispose of all of the questions here presented by: 1. Determining whether Senate Joint Resolution No. 24 is in contravention of constitutional provisions; and 2. whether, under House Bill No. 833, an indebtedness of the State of Colorado will be created which is violative of constitutional provisions. The answer to these two questions will definitely determine the specifications and cross specifications of points presented by the parties.

1. From the trial court's findings of fact and conclusions of law hereinbefore set forth, it is evident that the position taken by petitioners and interveners, and adopted by the court is that the provisions of House Bill No. 833, requiring approval by the General Assembly of a pledge of certain excise taxes, is valid; however, that a joint resolution is not a proper method of expressing such approval, *which must be done by the enactment of a bill.* It is, as we have said, contended by petitioners and interveners that even should we hold that a joint resolution is a proper method of expressing such legislative approval, nevertheless Senate Joint Resolution No. 24 is void and ineffectual because not passed in accordance with the provisions of section 39, article V of our Constitution.

We direct attention to article III of the Constitution of the State of Colorado: "The powers of the governments of this state are divided into three distinct departments,—legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted."

540

█ By this article the people have delegated to each Department certain powers and have expressly prohibited one department from trespassing and encroaching upon the powers and duties delegated to the other. To each of these departments has been delegated such portion of the sovereignty as was deemed expedient by the framers of the Constitution, and while collaboration between the departments is not expressly prohibited, and sometimes expressly enjoined by the Constitution, yet one cannot divest itself of, nor transfer to another, the power and authority expressly granted it by the Constitution.

█ In section 11, article IV of our Constitution, it is provided that no bill passed by the General Assembly shall become a law until it is presented to the Governor for his approval or disapproval. Sections 17 to 22, of article V, of the Constitution set forth mandatory provisions with which the legislative department must strictly comply in the enactment of bills, but there is no contention here that Senate Joint Resolution No. 24 is a bill within constitutional provisions. No decision has been called to our attention, nor has an exhaustive search revealed any, which would support the trial court's finding and conclusion that the approval of the General Assembly with which we are here concerned must be by bill as that term is used in our Constitution, and we hold that in so doing the trial court was in error.

█ The trial court further held that even though Senate Joint Resolution No. 24 was adopted in strict compliance with the provisions of section 39, article V of our Constitution, it would be a complete nullity, and of no legal force and effect.

It must be conceded that Senate Joint Resolution No. 24 was considered by the members of the General Assembly as a valid approval as required by House Bill No. 833 and was within their exclusive prerogative under the provisions of section 39, article V, supra, which

reads: "Every order, resolution or vote to which the concurrence of both houses may be necessary, except on the question of adjournment, *or relating solely to the transaction of business of the two houses,* shall be presented to the governor, and before it shall take effect, be approved by him, or being disapproved, shall be repassed by two-thirds of both houses, according to the rules and limitations prescribed in case of a bill." (Italics ours)

Section 12, article V, of our Constitution, empowers each house (House of Representatives and Senate) to determine the rules of its proceedings, and, pursuant to this authorization, the House of Representatives adopted rule 25, Rules of Procedure of the House, 37th General Assembly, State of Colorado, 1949, reading as follows: "1. Every order, resolution and vote to which the concurrence of both Houses may be necessary and require the approval of the Governor, are denominated Concurrent Orders and Resolutions, and shall be subject to the rules and limitations and shall take the same course as prescribed in case of bills. 2. All resolutions pertaining to the joint business of both Houses or the manner of its transaction shall be deemed joint resolutions, and shall be laid over one day, if objection be made; if no objection be made, may be considered immediately upon presentation."

Likewise the Senate adopted Rule XXX, found in Senate Rules of Law 1949, reading as follows: "1. All resolutions, memorials, and other papers requiring the signature of the Governor, are denominated Concurrent Resolutions and shall be treated in all respects in the introduction and the form of proceeding in a similar manner with bills. 2. All resolutions pertaining to the joint business of both houses or the manner of its transaction shall be deemed Joint Resolutions. 3. All resolutions, unless involving the expenditure of public moneys, or unless some Senator give notice of a desire

to debate the same may be acted on at once; otherwise they shall lay over one day."

In the agreed abstract of record it was stipulated that Senate Joint Resolution No. 24 was neither signed by, nor "submitted" to, the Governor for his signature.

It is argued by petitioners and interveners that Senate Joint Resolution No. 24 was invalid and of no legal force and effect whatever because it was not "presented to the governor, and before it shall take effect, be approved by him, or being disapproved, shall be repassed by two-thirds of both houses, according to the rules and limitations prescribed in case of a bill." Section 39, article V, Constitution of the State of Colorado. As we understand the position taken by these parties, they contend that the approval evidenced by Senate Joint Resolution No. 24 does not relate "solely to the transaction of business of the two houses."

In adopting our Constitution it is reasonable to suppose that the framers thereof gave careful study to the Constitution of the United States and decisions relative thereto. Subsection 3, section 7, of Article I, of the Constitution of the United States reads: "Every order, resolution or vote, to which the concurrence of the senate and house of representatives may be necessary (except on a question of adjournment) shall be presented to the president of the United States; and, before the same shall take effect, shall be approved by him, or being disapproved by him shall be repassed by two-thirds of the senate and house of representatives, according to the rules and limitations prescribed in the case of a bill."

It will be noted that our section 39, article V is almost identical with this provision of the Constitution of the United States except our section 39 contains the following: "or relating solely to the transaction of business of the two houses." In 1798 the Supreme Court of the United States, in *Hollingsworth v. Virginia*, 3 Dallas 378, had occasion to determine a question which was said to be governed by the provisions of said subsection 3, sec-

tion 7, article I, of the Constitution of the United States, it being there contended that a proposed constitutional amendment must be presented to the President because it was an order, resolution or vote. It is true that article V of the Constitution of the United States, as well as article XIX of our Constitution, has a special provision concerning constitutional amendments, and because of these provisions, and because amendments are substantive acts not connected with legislation, as that term is ordinarily used, it was held that it was not within the provisions of the federal Constitution granting the President the right of approval or disapproval of resolutions of Congress.

It has been said that the provisions of the Constitution, with relation to resolutions, orders and votes, have been construed to include only such resolutions as are legislative in character, and that it has never been the practice of the Congress of the United States to present to the President, for his approval, concurrent resolutions, orders or votes in regard to matters not strictly legislative.

We appreciate that *Hollingsworth v. Virginia, supra,* is not directly in point because of the expressed constitutional provisions with reference to amendments; nevertheless it is clearly indicative that said subsection 3, section 7, article I, of that Constitution, is not all-inclusive; likewise, with reference to constitutional amendments in our jurisdiction, we find in the case of *People ex rel. v. Ramer,* 62 Colo. 128, 160 Pac. 1032, language which we believe applicable here: "Moreover, section 39 of article V does not require every order, resolution or vote, to which the concurrence of both houses may be necessary, to be presented to the Governor for his approval or disapproval, and, upon disapproval, to be repassed by two-thirds of both houses. On the contrary, those relating to 'adjournment' or 'solely to the transaction of business of the two houses' are expressly excluded."

A decision most nearly in point and helpful in our determination is *Richardson v. Young,* 122 Tenn. 471, 125 S.W. 664. Section 18, article III of the Tennessee Constitution, provides, inter alia: "Every Joint Resolution or Order (except on questions of Adjournment), shall likewise be presented to the governor for his signature, and before it shall take effect shall receive his signature; and on being disapproved by him shall, in like manner, be returned with his objections; and the same, before it shall take effect, shall be repassed by a majority of all the members elected to both houses, in the manner and according to the rules prescribed in case of a bill."

It will be noted that this constitutional provision is substantially the same as ours except we have the phrase "relating solely to the transaction of business of the two houses,". As we read and understand the decision in *Richardson v. Young, supra,* it was therein held that that provision of the Constitution is confined solely to resolutions or orders which are strictly legislative in character, rather than those which are related to mere matters of formal procedure, in which matters the Senate and House have exclusive control.

In *Richardson v. Young, supra,* it is said that the construction of our federal Constitution (subsection 3, section 7, article I) was considered in a report of the Judiciary Committee of the United States Senate in 1897, a part of which report is as follows: "We conclude this branch of the subject by deciding the general question submitted to us, to wit, 'whether concurrent resolutions are required to be submitted to the president of the United States,' must depend, not upon their form, but upon the fact whether they contain matter which is properly to be regarded as legislative in its character and effect. If they do so, they must be presented for his approval; otherwise, they need not be. In other words, we hold that the clause in the constitution which declares that every order, resolution, or vote must be

presented to the president, to 'which the concurrence of the senate and house of representatives may be necessary,' refers to the necessity occasioned by the requirement of the other provisions of the constitution, whereby every exercise of 'legislative powers' involves the concurrence of the two houses; and every resolution not so requiring such concurrent action, to wit, not involving the exercise of legislative powers, need not be presented to the president. In brief, the nature or substance of the resolution, and not its form, controls the question of its disposition. 4 Hinds' Precedents of the house of representatives, secs. 3482-3483."

Before proceeding further, it is well to have clearly in mind the several steps taken by the State Highway Department, and the legislative and executive departments in respect to the Denver-Boulder turnpike. In 1949 the General Assembly enacted, and the Governor approved, House Bill No. 833, which conferred additional powers on the State Highway Department. It permitted the State Highway Department to adopt master plans for the development and improvement of the State Highway system; it permitted the State Highway Department to enter into contracts *with the approval of the Governor;* it authorized the State Highway Department to issue bonds payable in part from a certain described fund when approved by "the affirmative majority vote of the entire membership of the highway advisory board and the affirmative vote of the *Governor* and of the State Engineer (said Board and Officers being the trustees of the State Highway Department)."

It should be remembered that the Governor approved a resolution of the State Highway Advisory Board providing for the construction and operation of the Denver-Boulder turnpike and that there was set forth in the resolution the substantial requirements as to construction of the turnpike and the issuance and payment of bonds authorized by House Bill No. 833. In addition to the approval of the State Highway Advisory Board, the

Governor and the State Engineer, the act provided in several places for the approval of the Denver-Boulder turnpike by joint resolution of the Senate and House of Representatives before it could become a reality. This approval by joint resolution was a condition precedent to the consummation of the Denver-Boulder turnpike project. The General Assembly, in enacting House Bill No. 833, and the Governor by his approval thereof, meticulously safeguarded the interests of the state. Thus it will be seen that before the construction and operation of a turnpike under House Bill No. 833 could be begun, it required the independent approval of the State Highway Advisory Board, the State Engineer, the Governor, and the General Assembly. Without the concurrence of all these, the Denver-Boulder turnpike could not become a reality, and, in our judgment, it was a wise provision that all of these necessary approvals be independent. House Bill No. 833, in so far as it provided for the approval of the General Assembly, required of it a joint resolution clearly within the provisions of section 39, article V. It was a matter *relating solely to the transaction of the business of the two houses,* as that phrase is used in said section, and it was unnecessary to present Senate Joint Resolution No. 24 to the Governor for his approval or disapproval.

We are mindful of a general rule which requires that courts adopt, where possible, a construction of a constitutional provision in keeping with that given it by co-ordinate branches of government; but we also are aware of the fact that the construction so given by co-ordinate branches of government is not absolutely controlling.

We are convinced that Senate Joint Resolution No. 24, not being legislative in character, related solely to the business of the General Assembly. It was a lawful exercise of a valid power launched in the legislative branch of the government, and under the statute here, a proper method by which to express legislative approval of the

Denver-Boulder turnpike; this approval was in strict conformity with the provisions of House Bill No. 833. Having determined that it was a matter not legislative in character, it follows that it was one with which the Governor was not in the least concerned, and, therefore, it was not necessary, as we have said, that Senate Joint Resolution No. 24 be presented to the Governor for his approval or disapproval.

The trial court erred in holding Senate Joint Resolution No. 24 a nullity and of no legal force and effect.

█ Every statute, duly passed, *must* be declared constitutional unless the contrary appears beyond reasonable doubt.

█ 2. We are called upon to determine whether House Bill No. 833 provides for the creation of an indebtedness or the pledging of credit of the State of Colorado contrary to constitutional provisions. In 1934, section 18, article X was adopted. It reads: "On and after July 1, 1935, the proceeds from the imposition of any license, registration fee or other charge with respect to the operation of any motor vehicle upon any public highway in this state and the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel shall, except costs of administration, be used exclusively for the construction, maintenance, and supervision of the public highways of this state." Vol. 5, '35 C.S.A., p. 207.

The General Assembly, in 1935, enacted laws, some new and some amendatory, to provide for the expenditure of the funds so "ear-marked" by the constitutional amendment. (Chapters 124 and 181, Session Laws 1935)

It is well to remember that, while House Bill No. 833 authorizes the issuance of bonds and provides for the payment thereof from a special sinking fund thereby created, hereinbefore noted, the bonds are to be bonds of the State of Colorado *"payable from a fund consisting of the fees, fares and tolls derived from any desig-*

*nated turnpike project* and, with the approval of the General Assembly evidenced by joint resolution of the Senate and House of Representatives, additionally secured by a pledge of and payable from a special fund set aside from the State Highway Fund, provided, however, that the amount so set aside and pledged shall not exceed in any one year thirty per cent of the total of the following: (1) The amount of principal and interest falling due during such year, and (2) The amount required to be paid into the special sinking fund as a reasonable reserve for the payment of the bonds hereinafter authorized in accordance with the resolution of the State Highway Department authorizing their issuance as approved by the joint resolution of the Senate and House of Representatives." (Italics ours)

It is further provided in said House Bill No. 833 that its terms and provisions shall not be construed as "authorizing the contracting by the State of a debt by loan in any form nor the pledging of general taxes of the State." Under the provisions of said constitutional amendment, all of the funds derived from the excise taxes therein mentioned were earmarked "exclusively for the construction, maintenance, and supervision of the public highways of this state," and never became general revenue subject to legislative appropriation.

Petitioners and interveners urge that House Bill No. 833 violates sections 3 and 4 of article XI of the Constitution. Section 3 of said article provides in part: "The state shall not contract any debt by loan in any form, except * * * [enumerating purposes not here material]." Section 4, article XI, provides, inter alia: "In no case shall any debt above mentioned in this article be created except by a law which shall be irrepealable, until the indebtedness therein provided for shall have been fully paid or discharged; * * * "

Subsequent to the adoption of the above constitutional amendment, our decision in *Johnson, Governor, et al. v. McDonald,* 97 Colo. 324, 49 P. (2d) 1017, was announced,

wherein the various contentions here urged by petitioners and interveners were presented. It would unduly prolong this opinion to quote from our opinion in that case; suffice it to say that the contentions of petitioners and interveners were therein discussed and overruled.

For brevity we note that the syllabus in *Johnson v. McDonald, supra,* well supported by the opinion, reads in part:

"5. The pledging of future excise revenues, which are restricted by the Constitution to use for construction, maintenance and supervision of the public highways of the state, for the making up of a fund to pay 'anticipation warrants,' held not to create a debt within the prohibition of sections 3 and 4, article XI, of the Constitution."

"7. The state legislature may make a contract or authorize the making of a contract by a state institution —the highway department—and if the contract necessitates the continued existence of existing legislation, then future legislatures are barred by the contract from modifying the legislation so that the obligation of the contract will be impaired, in violation of the constitutional restrictions imposed by section X, article I, of the United States Constitution."

"10. * * * The 1934 amendment of article X of the Constitution itself makes an appropriation of the funds mentioned therein and none is necessary by the legislature; * * * "

In Interveners' brief herein, counsel frankly admit that our decision in "Johnson v. McDonald is controlling, but this court is not bound to affirm its misconstruction. Johnson v. McDonald affirmed the Special Fund Doctrine of In Re Senate Resolution No. 2. That doctrine should be enforced as properly construed."

Our attention is directed to our decision in *In Re Senate Resolution No. 2,* 94 Colo. 101, 31 P. (2d) 325, which was announced prior to the adoption of section 18, article X of our Constitution. We are led to believe

that the said constitutional amendment was the result of our decision in that case. It is interesting to note that one of the questions propounded to this court in *In Re Senate Resolution No. 2* was: "2. Does House Bill No. 6 provide for the creation of a debt of the state within the meaning of Sections 3 and 4 of Article XI of the Constitution of the State of Colorado?" This question was answered by us in the affirmative, and for this and other reasons said House Bill No. 6 was declared unconstitutional. The excise taxes mentioned in the constitutional amendment, supra, prior to its adoption, became part of the general funds of the State of Colorado, subject to legislative appropriation, and this is made clear in the opinion. However, we do note that the Attorney General contended that while it appeared that House Bill No. 6 authorized the state to contract a debt, "it does not in fact do so because payment thereof must be made from a special fund," and in such cases this and other courts, by a course of reasoning here applicable, have held that no debt is thus contracted within the constitutional prohibition. In our opinion in *In Re Senate Resolution, supra,* we said:

"In examining this position it must be remembered that the act allocates to the payment of the debt, not anticipated revenue from an improvement or industry created by the act, nor even revenue from a source first tapped by it, but revenue already provided in past years, and at present flowing into the state treasury at the rate of millions of dollars per annum.

"Since the purpose of section 3 of article XI is to prevent the pledging of revenues of future years, a statute which *at the same time it creates a debt, creates the fund to pay it, and which fund would not be otherwise available for general purposes, is clearly outside the constitutional prohibition.* If, for example, the state could purchase a machine for making gold out of common clay, and agreed to pay for the contrivance only out of the product, that debt would not be prohibited by

said section 3. A careful examination into the character of all debts excluded by judicial construction form [from] the prohibition of said section, and sanctioned under the 'special fund' doctrine, will demonstrate that they fall clearly within this class. Into it readily fall debts for local improvements to be paid for by special assessments. (citing cases)

"In such cases the improvement is paid for solely out of the value which it adds to the property of the taxpayer.

"Into the same class, and just as clearly, fall debts for public utilities to be paid for from the proceeds of the utility. *Shields v. City of Loveland,* 74 Colo. 27, 218 Pac. 913; *Searle v. Town of Haxtun,* 84 Colo. 494, 271 Pac. 629; *Reimer v. Town of Holyoke,* 93 Colo. 571, 27 P. (2d) 1032. In such cases the utility is paid for solely out of the revenue it produces, or extensions and improvements (if for such the debt is contracted) are paid for out of the increased revenue which they produce." (Italics ours)

The State Highway Department could, under the authority granted it by statute, have undertaken to construct a highway between Denver and Boulder and borne the entire expense thereof and paid the same in cash or by the issuance of bonds payable out of a sinking fund supplied by the excise taxes allocated for highway purposes by section 18, article X of the Constitution, and the fact that the department has appropriated only a part of the funds earmarked for public highways—a turnpike is expressly made such by House Bill No. 833—presents no constitutional objection.

We hold that the General Assembly's adoption of Senate Joint Resolution No. 24, legally and validly expressed approval of the turnpike project authorized by House Bill No. 833. We further hold that the bonds provided in House Bill No. 833 do not create a debt of the State of Colorado prohibited by sections 3 and 4 of article XI of the Constitution and that their issuance

552

would violate no other provision thereof specifically called to our attention or otherwise noted by us.

Accordingly, the judgment is reversed.

MR. CHIEF JUSTICE HILLIARD and MR. JUSTICE HOLLAND dissent.